UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------X

NANCY LUGO                                    **MEMORANDUM AND ORDER**
                                              18-CV-2828 (KAM)

                  Plaintiff,

    -against-


COMMISSIONER OF SOCIAL SECURITY,

                  Defendant.

--------------------------------------X

**KIYO A. MATSUMOTO, United States District Judge:**

    Plaintiff Nancy Lugo ("plaintiff" or "claimant") appeals the final decision of the Commissioner of the Social Security Administration ("SSA") ("defendant" or the "Commissioner"), which found Plaintiff not disabled and thus not entitled to disability insurance benefits ("DIB") under Title II of the Social Security Act ("the Act").  Before the court are the parties' cross-motions for judgment on the pleadings.  For the reasons set forth below, the Commissioner's motion for judgment on the pleadings is DENIED, Plaintiff's motion is GRANTED, and this action is REMANDED for further proceedings consistent with this Memorandum and Order.

1

## BACKGROUND

The factual and procedural background leading to this action is set forth in the administrative record (ECF No. 16, Administrative Transcript ("Tr.")).  The court has reviewed the parties' respective motions for judgment on the pleadings and the administrative record.

The parties entered into a joint stipulation of facts on March 12, 2019. (ECF No. 15-1.)  The court does not incorporate those facts entirely into the record, as the court finds that they are not fully accurate.  The court discusses the facts relevant to its determination, as set forth herein.

### I.   Procedural History

Plaintiff applied for DIB on May 30, 2013, alleging that she became disabled on June 1, 2012 due to anxiety and depression.  (Tr. at 158-159, 178.)

On October 2, 2013, the Social Security Administration ("SSA") denied plaintiff's application, based on a finding that plaintiff was not disabled within the meaning of the Act.  (*Id.* at 89-93.)  In response, plaintiff requested an administrative hearing before an Administrative Law Judge ("ALJ") on November 26, 2013.  (*Id.* at 103-104.)  Plaintiff appeared with her attorney at a hearing on December 3, 2015 and testified before ALJ Lori Romeo ("ALJ Romeo" or the "ALJ").  (*Id.* at 40-76.)  In addition to plaintiff's testimony, ALJ Romeo also reviewed the

2

testimonial interrogatory responses of Miriam Greene, a
vocational expert ("VE"), which were submitted on December 9,
2015.  (*Id.* at 232-240.)

Prior to scheduling a vocational expert, the ALJ asked the
plaintiff's attorney to amend the onset date, apparently because
the plaintiff's condition worsened in July 2015, and offered to
award benefits from that date.  "She starts what in July or
August – July of 2015.  So that's what I'm looking at.  So what
are we doing?"  (*Id.* at 70.)  It was only after the plaintiff's
attorney refused to amend the onset date that the ALJ stated,
"Very good.  We'll have a supplemental hearing with a vocational
expert."  (*Id.*)  On May 31, 2016, the ALJ issued a decision
finding plaintiff not disabled within the meaning of the Act and
denying plaintiff's application for DIB. (*Id.* at 25-39 ("ALJ
Decision").).

Plaintiff appealed the ALJ Decision to the Appeals Council on
June 26, 2017.  (*Id.* at 154-156.)  At the time that the appeal was
filed, plaintiff's attorney advised that the hearing office had
misplaced the decision in the matter and had served him on June
23, 2017 with a decision dated June 23, 2017.  (*Id.* at 155.)  The
first three pages of the decision, which should include on page
one the date that the decision was issued, are missing from the
decision as it appears in the administrative record.  (*Id.* at 25-
39.)  On April 2, 2018, the Appeals Council denied plaintiff's

3

request for review, and the ALJ's decision became the Commissioner's final determination. (*Id.* at 1-7.) Plaintiff commenced the instant action on May 11, 2018. (*See generally* ECF No. 1, Compl.)

## II.  Personal, Employment, and Non-Medical Factual Background

Plaintiff was born on December 28, 1964, is 5'3" tall, and weighs 165 pounds. (Tr. at 78.) Plaintiff is fluent in English and received a GED in 1982. (*Id.* at 177, 179.) At plaintiff's ALJ hearing on October 19, 2015, plaintiff stated that she lived with her 18-year-old daughter and her one-year old grandchild but she did not care for her grandchild. (*Id.* at 48-49.) She testified that she was let go from her job in June 2012 because her work had begun to suffer when she "felt herself unraveling." (*Id.* at 52.) She testified that she had difficulty concentrating and was forgetting things (*id.* at 52) and started therapy in July 2012. She underwent several rounds of medication but the medications were adjusted and her symptoms continued to fluctuate; at times she felt better, and other times did not want to get out of bed. (*Id.* at 53-54.)

Plaintiff testified that she no longer cooked or cleaned and could not remember exactly when she stopped. (*Id.* at 54-55.) The ALJ asked the Plaintiff if a reference that she was able to cook and clean in 2015 would have been reliable and she stated yes. (*Id.* at 55.)

4

Plaintiff testified that she was a social person prior to her illness but now could not even get through a baseball game on TV and stated that her decline was "gradual." (*Id*. at 56.) She testified that she started to be so forgetful that her daughters needed to start paying her bills in 2014, but could not state exactly when. (*Id*. at 58.)

Plaintiff testified that in June 2015, she was hospitalized and had stopped taking her medications because she felt that they were not working. (*Id*. at 58.) She testified that following her hospitalization, Dr. Denigris opined that her medication dosage was not strong enough and increased it, but her new dosage of medication made her drowsy, restless, jittery and dizzy. (*Id*. at 59-60.) Plaintiff testified that she had stopped smoking marijuana in 2012, but had had a three-week relapse in 2014. (*Id*. at 61-62, 64-65.) Plaintiff testified that after losing her job she went on interviews but was anxious and could not concentrate. (*Id*. at 67.)

**III. Medical and Vocational Facts**

The administrative record includes plaintiff's medical records dating back to July 2012. (*Id*. at 324-326.) Thus, all medical records reflect treatment rendered after the alleged onset date. Because plaintiff's appeal focuses on the ALJ's findings as to her mental impairments, the court will address

only those records which pertain to treatment for mental illness.

### i.  Medical Records

On July 19, 2012, plaintiff was seen at Lutheran Family Health Center ("Lutheran") for a psychiatric intake appointment by social worker Allison Lopez-Galtman, LCSW, in conjunction with Jean Baily, Ph.D.  (*Id.* at 324-27.)  She presented with symptoms of depression, such as insomnia, lack of energy, crying spells, irritability, social isolation, and difficulty concentrating.  (*Id.*)  Her thought content was marked by "anxious pre-occupation."  (*Id.*)  She reported flashbacks about past traumas from her childhood.  (*Id.*)  Plaintiff reported that she had a boyfriend and was receiving unemployment insurance. (*Id.* at 325.)  Regarding interpersonal relationships, plaintiff was described as "socially isolated."  (*Id.* at 325.)  She was capable of using public transportation, could maintain her own financial benefits, and socialized.  (*Id.*)  Upon mental status examination, Plaintiff was cooperative, well-related, and exhibited normal and unremarkable motor activity.  (*Id.* at 324.) Her mood was depressed, sad, and anxious; thought process was normal and insight was good despite anxiously preoccupied thought content.  (*Id.*)  Moderate depression and prolonged post-traumatic stress disorder ("PTSD") were diagnosed.  (*Id.* at

325.)  Ms. Lopez-Galtman assessed plaintiff had a global assessment of functioning ("GAF") score of 60.[1]

On August 15, 2012, Plaintiff presented to Nurse Practitioner ("NP") Diane Cuff-Carney at Lutheran for an initial medication management session, reporting moderate levels of depression, anxiety, and insomnia.  (*Id*. at 321-22.)  Plaintiff was well-groomed with good hygiene and was cooperative.  (*Id*. at 321.)  She exhibited hypoactive psychomotor activity and normal speech; her mood was depressed and her affect constricted. (*Id.*) Her thought process was intact with unremarkable thought content, no evidence of perceptual disorder or poor insight, with good judgment and impulse control.  (*Id.*)  NP Cuff-Carney diagnosed moderate major depressive disorder, single episode, and PTSD, and prescribed Celexa.  (*Id*. at 321.)

Plaintiff saw Catherine Knopp, LCSW, at Lutheran on January 4, 2013. (*Id*. at 293.)  Plaintiff had broken up with her boyfriend.  (*Id*.)  Her mood was depressed and anxious, her affect reactive, and her thoughts logical. (*Id*.)

---

[1] GAF is a rating of overall psychological functioning on a scale of 0 to 100. *See American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed., text rev. 2000) (DSM-IV).  A GAF of between 51 and 60 indicates moderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers).  *Id.*  The APA discontinued use of the GAF for mental disorder diagnoses in the DSM-V published in 2013. *See Pelt v. Colvin*, No. CV 15-0533 (DRH), 2017 WL 684192, at *5, n.1 (E.D.N.Y. Feb. 21, 2017).

On January 8, 2014, plaintiff presented to NP Cuff-Carney reporting no success in treating her depression or insomnia. (*Id.* at 292.)  Plaintiff was well-groomed with good hygiene and was cooperative.  (*Id.* at 321.)  She exhibited hypoactive psychomotor activity and normal speech.  (*Id.*)  Her mood was depressed and anxious, and her affect constricted.  (*Id.*)  Thought process was preserved, and thought content was anxious preoccupation.  (*Id.*)  Her insight and judgment were poor and impulse control was fair.  (*Id.*)  NP Cuff-Carney prescribed Zoloft and Risperdal.  (*Id.*)

On January 11, 2013, plaintiff described to Ms. Knopp difficulty living with her three daughters and boyfriend.  (*Id.* at 291.)  Plaintiff had depressed and anxious mood and reactive affect, no evidence of hallucinations, and logical thoughts. (*Id.*)  Ms. Knopp noted a GAF score of 60.  (*Id.*)

Plaintiff continued treatment with Ms. Knopp and her mental status examinations continued to show sad/anxious mood, constricted affect, perseverative thought process[2], and anxious preoccupation.  (*Id.* at 242, 244, 248, 252, 255, 258, 261, 264, 273, 275, 276, 279, 283, 288.)  LCSW Knopp also recorded GAF scores of 60 during this time.  (*Id.* at 279, 283, 288.)  On

---

[2] Perseveration is a collective term to characterize the continuous intrusion of negative recollection of past traumatic events, *i.e.*, flashbacks, or recurrent intrusive fear of a future event.  *Dorland's Medical Dictionary Online* (32nd ed. 2011), available at www.dorlands.com.

February 6, 2016, LCSW Knopp documented that Plaintiff had inconsistent attendance with medication follow-up.  (*Id.* at 283.)  On February 26, 2013 Knopp noted that plaintiff had hypoactive motor activity, constricted affect, perseverative thought, agitation and poor insight and judgement.  (*Id.* at 282.)  On March 1, 2013, plaintiff expressed negative feelings toward all family in her household.  (*Id.* at 279.)  On March 15, 2013, plaintiff complained that she is "anxious all the time" and overwhelmed.  (*Id.* at 276.)  On March 26, 2013, plaintiff had constricted affect, depressed mood, perseverative thought process, anxious preoccupation, and poor insight and judgment. (*Id.* at 274.)  Dr. Pye found that plaintiff had akatisia[3], anergia, hypomotor activity and thought-blocking since being prescribed Celexa and the medication was discontinued.  (*Id.* at 273.)  The assessment noted that her condition was "unimproved." (*Id.*)  On April 5, 2013, plaintiff reported having an "episode" on the subway into Manhattan on the way to see a movie and complained that she did not think that her medications were working.  (*Id.* at 273.)  She had begun working as a building superintendent, and enjoyed the responsibilities associated with the job.  (*Id.*)  On April 11, 2013, plaintiff reported great improvement which she thought was the result of seeing a

---

[3] Akathisia is a movement disorder characterized by an inability to stay still.  *Dorland's Medical Dictionary Online* (32nd ed. 2011), available at www.dorlands.com.

"wisewoman" who counteracted "black magic." (*Id.* at 271.)   LCSW
Knopp completed a treatment plan review on April 26, 2013,
noting plaintiff had achieved improved control of her symptoms,
improved her temper and how she expressed anger, and had started
to enjoy cooking with her daughters, although she continued to
ruminate and to experience hypervigilance related to PTSD and
had difficulty travelling to Manhattan on public transportation.
(*Id.* at 266.)   During her May 3 session, Plaintiff stated she
felt that her symptoms had improved because she was working, but
noted that she remained "off-kilter" some days.   (*Id.* at 264.)
On May 14, 2013, plaintiff's mental status exam remained
unchanged with sad/anxious mood, constricted affect,
perseverative thought process, anxious preoccupation, impaired
attention and concentration, and poor insight and judgment.
(*Id.* at 263.)

During treatment with NP Cuff-Carney through June 2013,
plaintiff's recorded mental status examinations continued to
show sad/anxious mood, constricted affect, poor judgement and
insight, impaired attention and perseverative thoughts.   (*Id.* at
257, 263, 269, 272, 274, 282 285, 289.)   Medications were
changed at times to address side effects and reported
functioning changes.   (*Id.* at 257, 263, 272, 274, 285, 289.)

On July 5, 2013, plaintiff reported that she enjoyed having
spent the Fourth of July holiday with her sister, boyfriend and

his mother.  (*Id.* at 245.)  Her mental status remained
unchanged.  (*Id.*)  Plaintiff expressed panic on July 12, 2013
after her unemployment benefits ran out and noted feeling
hypervigilance with cold sweat and racing thoughts outside of
her home.  (*Id.* at 242.)  During her therapy session on July 26,
2013, she noted difficulty leaving her house and intrusive
thoughts, though she was working on reconnecting with friends.
(*Id.* at 244.)

Thereafter, on August 7, 2013, plaintiff reported to NP
Cuff-Carney an increase in insomnia and anxiety with mood swings
into anger during the day.  (*Id.* at 243.)  NP Cuff-Carney
observed normal appearance, cooperative attitude, normal
psychomotor activity, and normal speech.  (*Id.*)  Plaintiff's
mood was described as sad, anxious, angry, and uneasy, her
affect labile, thought-content was anxious preoccupation.  (*Id.*)
Plaintiff's insight and judgment were poor, and her attention
span and concentration were impaired, while her memory was
intact.  (*Id.*)  NP Cuff-Carney increased plaintiff's Wellbutrin
dosage and prescribed Depakote.  (*Id.*)

On August 27, 2013 Melissa Malakoff, Psy.D., conducted a
consultative psychiatric evaluation of plaintiff.  (*Id.* at 294-
98.)  Plaintiff was driven to the evaluation by a friend.  (*Id.*)
At the time, plaintiff lived with her two daughters, ages 22 and
16.  (*Id.*)  She alleged disability due to severe anxiety,

11

restless nights, depression, bipolar disorder, and PTSD.  (*Id.*)
She reported difficulty falling asleep, loss of appetite, crying
spells, and concentration difficulties, as well as anxiety,
including excessive apprehension and worrying, flashbacks and
hypervigilence.  (*Id.* at 294-95.)  She drank alcohol two to
three times per month and had used marijuana every day from her
teenage years to her late twenties.  (*Id.* at 295.)  Plaintiff
was able to: dress, bathe, and groom herself; cook and prepare
food; perform general cleaning and do laundry; and manage her
own money.  (*Id.*)  Her daughter usually shopped for her because
she became overwhelmed.  (*Id.*)  Plaintiff stated that she did
not use public transportation because she became overwhelmed.
(*Id.*)  She had not socialized with any friends since the prior
year.  (*Id.*)  She spent time with her sister and watched
television.  (*Id.*)  Plaintiff stated that on good days she spent
all her time cleaning the house.  (*Id.* at 296-97.)  On bad days
she did not get out of bed.  (*Id.* at 297.)

Upon mental status examination, Plaintiff's demeanor and
responsiveness to questions were cooperative.  (*Id.* at 295.)
Her manner of relating, social skills, and overall presentation
were adequate.  (*Id.*)  The intelligibility of plaintiff's speech
was fluent, the quality of her voice was clear, and her
expressive and receptive language was adequate.  (*Id.*)
Plaintiff's thought process was coherent and goal-directed with

no evidence of hallucinations, delusions, or paranoia.  (*Id.* at
296.)  Her affect was depressed, mood was neutral, and sensorium
was clear; she was fully oriented.  (*Id.*)  Dr. Malakoff found
that the Plaintiff's recent and remote memory was intact,
despite the fact that she could recall only one out of 3 objects
after five minutes.  (*Id.*)  Attention and concentration were
intact.  (*Id.*)  Plaintiff's cognitive functioning was average
and her general fund of information was appropriate to
experience.  (*Id.*)  Plaintiff's insight and judgment were fair.
(*Id.*)

Dr. Malakoff diagnosed PTSD and ruled-out bipolar disorder.
(*Id.* at 297.)  She opined that plaintiff was able to follow and
understand simple directions and instructions, perform simple
tasks independently, maintain attention and concentration,
maintain a regular schedule, learn new tasks, make appropriate
decisions, and relate adequately with others.  (*Id.*)  Plaintiff
was moderately limited in her abilities to perform complex tasks
independently, but may be able to do so with supervision, and
appropriately deal with stress.  (*Id.*)  Dr. Malakoff related
that difficulties were caused by PTSD symptoms.  (*Id.*)

On August 27, 2013, during a consultative orthopedic
examination with Chiam Shtock, D.O., plaintiff related that she
was able to independently cook, clean, do laundry, shower,

13

dress, and groom.  (*Id*. at 299.)  Her daughter assisted with
shopping.  (*Id*.)

On August 30, 2013, Javier Senosiain, M.D., completed a
treatment report in connection with plaintiff's receipt of
public assistance benefits.  (*Id*. at 329-30.)  She was treated
for major depression and PTSD.  (*Id*.)  She had symptoms of
anxiety, sleep deficits, anxiety which led to anger outbursts,
severe flashbacks, and intrusive thoughts triggered by current
circumstances.  (*Id*. at 329.)  Plaintiff complied with
treatment, but there had been periods when anhedonia and
problems with concentration led to missed appointments.  (*Id*. at
229.)  Dr. Senosian noted that an episode in mid-August had led
to a serious relapse.  (*Id*. at 330.)  Dr. Senosiain opined that
plaintiff could not work for 12-months and stated that
"hypervigilance, intrusive thoughts, insomnia and most recently
disassociation have become acute."  (*Id*. at 330.)

On September 30, 2013, M. Graff, Ph.D., a New York State
agency psychological consultant, evaluated the evidence of
record and completed a psychiatric review technique form.  (*Id*.
at 80; *see id*. at 303.)  Dr. Graff determined that plaintiff
had: mild restriction of activities of daily living; mild
difficulties in maintaining social functioning; moderate
difficulties in maintaining concentration, persistence, or pace;
and had no episodes of decompensation.  (*Id*. at 80.)  Dr. Graff

14

also assessed Plaintiff's mental residual functional capacity
and determined that Plaintiff had the mental abilities and
social skills for entry level work.  (*Id.* at 85; see *id.* at 83-
85.)

On October 15, 2013, NP Cuff-Carney completed a treatment
report for the purposes of plaintiff's public assistance
benefits noting recurrent treatment for PTSD and major
depression.  (*Id.* at 331-32.)  She reported plaintiff was in a
"highly stressed" position prior to receiving treatment.  (*Id.*
at 331.)  NP Cuff-Carney additionally reported that within the
past six weeks, plaintiff's trauma-related symptoms had
increased, causing greater hypervigilance, intrusive memories,
some dissociative episodes, and resurgence of nightmares related
to childhood events.  (*Id.*)  NP Cuff-Carney opined that
plaintiff was unable to work for 12-months.  (*Id.* at 332.)

A mental medical source statement dated December 17, 2013,
was signed by NP Cuff-Carney and cosigned by Ms. Knopp and Dr.
Senosiain.  (*Id.* at 333-337.)  Plaintiff was seen for weekly
psychotherapy sessions and monthly medication management
starting July 19, 2012, for PTSD and mood disorder.  (*Id.* at
333.)  During the past year, plaintiff's GAF was rated 55/60 and
60 as the highest.  (*Id.*)  She was receiving treatment due to
unemployment and PTSD symptoms she had experienced since
childhood.  (*Id.*)  Depakote, Wellbutrin, and Buspar were

15

prescribed which had a positive impact on plaintiff's impairments. (*Id.*) The following signs and symptoms were identified: anhedonia; appetite disturbance; feelings of guilt or worthlessness; generalized persistent anxiety; difficulty with thinking and concentrating; persistent disturbances of mood or affect; apprehensive expectation; paranoid thinking or inappropriate suspiciousness; emotional withdrawal or isolation; intense and unstable interpersonal relationships and impulsive and damaging behavior; emotional lability; vigilance and scanning; easy distractibility; sleep disturbance; recurrent severe panic attacks. (*Id.* at 334.) At the time of the opinion, plaintiff's symptoms had increased due to a recent incident of domestic violence. (*Id.* at 333.) NP Cuff-Carney opined that plaintiff was unable to meet competitive standards of any mental abilities and aptitudes required of unskilled and semiskilled work, including following and carrying out simple instructions and tasks. (*Id.* at 335-36.) She also found that Plaintiff was seriously limited in her abilities to: interact appropriately with the general public; maintain socially appropriate behavior; adhere to basic standards of neatness and cleanliness; travel in unfamiliar places; and use public transportation. (*Id.* at 336.) To support her opinion NP Cuff-Carney cited: plaintiff's complaints of inability to sustain attention and recall; difficulty meeting her prior standard of

16

efficiency; reduced concentration and skills; impatience with self and others; difficulty interacting with others; poor hygiene; and inability to travel to unfamiliar places or use public transportation. (*Id*.) She noted low tolerance for questioning or expectations from others, infrequent haircuts and un-ironed clothing, lack of makeup, and panic in crowded trains. (*Id*.)

Plaintiff was admitted to Lutheran Medical Center on June 16, 2015, and discharged on June 18, 2015, due to acute psychotic issues, including mood lability, poor sleep, and nightmares. (*Id*. at 338-339.) Discharge diagnoses were: bipolar I disorder, most recent episode mixed severe with psychotic features; and PTSD. (*Id*. at 338.) Antipsychotic medications were prescribed upon discharge. (*Id*.)

On July 29, 2015, Michael Kushner, Ph.D., conducted a consultative psychiatric evaluation. (*Id*. at 307-10.) Plaintiff was driven to the evaluation by the father of her daughter. (*Id*.) She lived with her two daughters, ages 18 and 24, as well as a grandchild age 11 months. (*Id*.) Plaintiff reported trouble falling asleep, loss of appetite, and depressive symptomatology including difficulty getting out of bed, feeling weak and tired, and trouble interacting with people. (*Id*. at 306-07.) She also reported mood swings. (*Id*.) She drank alcohol once or twice a month and used to be a heavy

marijuana smoker.  (*Id.* at 308.)  Plaintiff related that she did
not get up and dress every day and that her daughters did
household chores and managed the money.  (*Id.* at 309.)  She did
not use public transportation and did not often socialize.
(*Id.*)  She did not get along very well with her family members.
(*Id.*)  She typically spends her day at home.  (*Id.*)

Mental status examination revealed Plaintiff's demeanor and
responsiveness to questions to be cooperative.  (*Id.* at 308.)
Her manner of relating, social skills, and overall presentation
were fair.  (*Id.*)  She maintained appropriate eye contact.
(*Id.*)  Plaintiff's speech intelligibility was fluent, the
quality of her voice was clear, and her expressive and receptive
language were adequate.  (*Id.*)  Her thought processes were
coherent and goal-directed with no evidence of hallucinations,
delusions, or paranoia.  (*Id.*)  Plaintiff's attention and
concentration were intact.  (*Id.* at 309.)  Her recent and remote
memory skills were mildly impaired, as she could only recall one
of three items after five minutes.  (*Id.*)  Plaintiff's
intellectual functioning seemed below average and general fund
of information appeared somewhat limited.  (*Id.*)  Insight and
judgment were fair.  (*Id.*)

Dr. Kushner diagnosed unspecified bipolar disorder and
ruled-out unspecified psychotic disorder.  (*Id.* at 310.)  He
opined that plaintiff had up to moderate limitations following

and understanding simple directions and instructions and
performing simple tasks independently.  (*Id.* at 309.)  Plaintiff
had moderate limitations maintaining attention and
concentration, maintaining a regular schedule, learning new
tasks, and performing complex tasks under supervision.  (*Id.* at
309-10.)

  Dr. Kushner also completed a medical source statement of
plaintiff's mental ability for work-related activities.  (*Id.* at
311-312.)  Dr. Kushner opined that plaintiff had mild
restrictions in her abilities to: understand and remember simple
instructions; carry out simple instructions; and make judgments
on simple work-related decisions.  (*Id.* at 311.)  Plaintiff had
moderate to marked limitations regarding her abilities to:
understand and remember complex instructions; carry out complex
instructions; and make judgments on complex work-related
decisions.  (*Id.*)  The basis for these restrictions was
plaintiff's reports of concentration and memory trouble.  (*Id.*)
Dr. Kushner opined that Plaintiff had moderate to marked
limitations: interacting appropriately with the public,
supervisors, and co-workers; and responding appropriately to
usual work situations and to changes in a routine work setting.
(*Id.* at 312.)  The basis for these restrictions was plaintiff's
reported symptoms of depression and bipolar disorder.  (*Id.*)

On July 20, 2015, Allison Norman, LMSW, of Lutheran, conducted an initial psychosocial assessment.  (*Id.* at 344-350.) Plaintiff had been referred by her primary care physician, Dr. Yar. (*Id.* at 344.)  She had been compliant with her medication since a recent hospitalization, but reported unexplained mood swings and sometimes was very aggressive and "bitchy" and socially isolated, with such "periods" lasting two to three weeks.  (*Id.*)  Plaintiff reported not caring about "anything" during these periods.  (*Id.*)  Other times she lived "floating on air."  (*Id.*)  Plaintiff lived in an apartment with her two children, ages 24 and 18, and an 11-month-old granddaughter. (*Id.*)  She had mild anxiety and mild depression. (*Id.* at 344-345.)  Plaintiff believed that prior therapy focused too much on her childhood; rather most of her stressors come from crowds and was also stressed about her future, noting that she was trying to find a job.  (*Id.* at 345.)  She reported poor concentration, forgetfulness, and anger management issues.  (*Id.*)  Her relationship with her two daughters was fair.  (*Id.* at 347.) Upon mental status evaluation, plaintiff was cooperative with pressured, talkative speech.  (*Id.* at 348-339.)  Her mood was anxious and uneasy and affect was congruent.  (*Id.* at 349.) Thought process was intact and tangential, content was unremarkable.  (*Id.*)  Insight and judgment was fair.  (*Id.*)  Ms. Norman assessed: bipolar affective disorder, depressed, severe

with psychotic behavior; and PTSD.  (*Id.*)  Global assessment of functioning (GAF) was rated as 52.  (*Id.*)

On July 21, 2015, LCSW Knopp drafted a discharge summary noting that plaintiff wanted a new provider due to an acute increase in symptoms following the death of her stepfather, which had required hospital treatment.  (*Id.* at 328.)

On August 10, 2015, Deborah Denigris, DNP,[4] of Lutheran, conducted an initial psychiatric evaluation, pursuant to plaintiff's hospitalization.  (*Id.* at 351-355.)  Denigris noted that plaintiff had a history of using cocaine and marijuana. (*Id.* at 352.)  She had not used cocaine for the past three to four years, though she still smoked marijuana.  (*Id.*)  Upon a mental status examination, plaintiff was cooperative with normal speech.  (*Id.* at 352-353.)  Mood was euthymic and affect was full range and congruent.  (*Id.* at 353.)  Thought process was logical and goal-directed; thought content was anxious preoccupation related to a possible upcoming eviction and how she would support herself.  (*Id.*)  Plaintiff had no perceptual disorder.  (*Id.*)  Plaintiff's insight and judgment were fair. (*Id.*)  She had normal recent memory.  (*Id.*) DNP Denigris' assessment was bipolar affective disorder, depressed, with psychotic behavior, PTSD and a GAF rating of 50.  *(Id.)*

---

[4] "DNP" stands for Doctor of Nursing Practice.

Plaintiff's medications (Risperdal, Divalproex, Trazodone, and
Clonidine) were refilled.  (*Id.* at 356.)  On October 5, 2015,
DNP Denigris completed a medical source statement of plaintiff's
ability to perform mental work-related activities.  (*Id.* at 357-
359).  DNP Denigris opined that plaintiff had mild restrictions
in her abilities to: understand, remember, and carry out simple
instructions.  (*Id.* at 357.)  Plaintiff had extreme limitations
regarding her abilities to: make judgments on simple work-
related decisions; understand and remember complex instructions;
carry out complex instructions; and make judgments on complex
work-related decisions.  (*Id.*)  DNP Denigris opined that
plaintiff had extreme limitations interacting appropriately with
the public, supervisors, and co-workers.  (*Id.* at 358.)
Plaintiff had marked limitations responding appropriately to
usual work situations and to changes in a routine work setting.
(*Id.*)  DNP Denigris opined these limitations started in January
2015.  (*Id.*)

### ii.  **Vocational Interrogatory Response of December 9, 2015**

On December 9, 2015 Vocational Expert ("VE") Mariam Greene
completed vocational interrogatories.  (*Id.* at 233-40.)  She
indicated plaintiff had past work as an accounts payable
bookkeeper, an appointment clerk, and an office manager.  (*Id.* at
233.)  The ALJ asked the VE to consider a hypothetical

individual with Plaintiff's vocational profile (age, education, and work experience) with limitations as follows:

> perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) and can sit, walk and stand in an 8-hour day with normal work place breaks. The person can kneel, crouch, bend, and use their arms and hands without limitation. The person can occasionally squat. The person has some mental issues and there is some evidence that alcohol abuse is in sustained partial remission and cannabis abuse is in sustained partial remission resulting in the person being able to follow and understand simple instructions, perform simple tasks independently, maintain attention and concentration for simple tasks, keep a schedule and learn new tasks and perform more complex tasks with supervision. The person can adequately relate to others but has moderate problems with stress, which must be accommodated by having goal oriented, rather than production rate pace tasks. (*Id.* at 236.)

The VE stated that such an individual could perform plaintiff's past work as an appointments clerk (Dictionary of Occupational Titles ("DOT") 237.367-010), a sedentary exertional position with a specific vocational profile (SVP) of 3 (*Id.* at 233, 236-37.) VE Greene explained that the position of appointment clerk was at the lowest of the semi-skilled levels and did not require production rate pace. (*Id.* at 234.) VE Greene noted that such an individual could also perform light exertional, unskilled occupations, existing in significant number in the national economy, including: locker room attendant (DOT 358.677-014), of which there are 60,000 positions in the national economy; parking lot cashier (DOT 211.462-010), of

which there are 300,000 positions in the national economy; and price marker (DOT 209.587-034), of which there are 300,000 positions in the national economy.  (*Id.* at 235.)

## STANDARD OF REVIEW

Unsuccessful claimants for disability benefits may bring an action in federal court seeking judicial review of the Commissioner's denial of their benefits. 42 U.S.C. §§ 405(g), 1383(c)(3). The reviewing court does not have the authority to conduct a *de novo* review, and may not substitute its own judgment for that of the ALJ, even when it might have justifiably reached a different result. *Cage v. Comm'r*, 692 F.3d 118, 122 (2d Cir. 2012). Rather, "'[a] district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error.'" *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (quoting *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)).

"Substantial evidence means 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004)). If there is substantial evidence in the record to support the Commissioner's factual findings, those findings must be upheld. 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as

24

to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Inquiry into legal error requires the court to ask whether "'the claimant has had a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the [Social Security] Act.'" *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (quoting *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990)).

## DISCUSSION

### I. The Commissioner's Five-Step Analysis of Disability Claims

A claimant must be "disabled" within the meaning of the Act to receive disability benefits. *See* 42 U.S.C. §§ 423(a), (d). A claimant qualifies as disabled when she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* § 423(d)(1)(A); *Shaw*, 221 F.3d at 131–32. The impairment must be of "such severity" that the claimant is unable to do her previous work or engage in any other kind of substantial gainful work. 42 U.S.C. § 423(d)(2)(A).

The regulations promulgated by the Commissioner prescribe a five-step sequential evaluation process for determining whether a claimant meets the Act's definition of disabled. *See* 20 C.F.R.

§ 404.1520. The Commissioner's process is essentially as follows:

> [I]f the Commissioner determines (1) that the claimant is not working, (2) that [s]he has a 'severe impairment,' (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in [her] prior type of work, the Commissioner must find [her] disabled if (5) there is not another type of work the claimant can do.

*Burgess*, 537 F.3d at 120 (quoting *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003)); *accord* 20 C.F.R. § 404.1520(a)(4). If the answer at any of the previously mentioned steps is "no," the analysis stops and the ALJ must find that the claimant does not qualify as disabled under the Act.

"The claimant has the general burden of proving . . . his or her case at steps one through four of the sequential five-step framework established in the SSA regulations." *Burgess*, 537 F.3d at 128 (internal quotation marks and citations omitted). "However, [b]ecause a hearing on disability benefits is a nonadversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record." *Id.* (internal quotation marks omitted). "The burden falls upon the Commissioner at the fifth step of the disability evaluation process to prove that the claimant, if unable to perform her past relevant work [and considering her residual functional capacity, age, education, and work experience], is able to

26

engage in gainful employment within the national economy."
*Sobolewski v. Apfel*, 985 F. Supp. 300, 310 (E.D.N.Y. 1997).

"The Commissioner must consider the following in determining a claimant's entitlement to benefits: '(1) the objective medical facts [and clinical findings]; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability . . . ; and (4) the claimant's educational background, age, and work experience.'" *Balodis v. Leavitt*, 704 F. Supp. 2d 255, 262 (E.D.N.Y. 2001) (quoting *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (alterations in original)). If the Commissioner finds a combination of impairments, the Commissioner must also consider whether "the combined effect of all of [a claimant's] impairment[s]" establish the claimant's eligibility for Social Security benefits. 20 C.F.R. § 404.1523(c); *see also id.* § 416.945(a)(2).

## II. The ALJ's Application of the Five-Step Analysis

Using the five-step sequential process to determine whether a claimant is disabled as mandated by the SSA regulations, the ALJ made the following determinations:

At step one, the ALJ concluded that claimant had not engaged in substantial gainful activity since June 1, 2012, the alleged onset date. (*Id.* at 28.)

At step two, the ALJ found that claimant had four severe impairments: major depressive disorder; bipolar disorder;

posttraumatic stress disorder ("PTSD"); and substance abuse disorder. (*Id.*)  Additionally, the ALJ found that plaintiff had the nonsevere impairments of joint pain; hand pain; osteoarthritis, NOS in her hand; and locking of fingers. (*Id.* at 29.)  The ALJ did not, however, adequately perform the psychiatric review technique as mandated by 20 C.F.R. § 404.1520a.[5] (*Id.* at 32-34.).

At step three, the ALJ found that plaintiff did not have an impairment or combination of impairments that meets or medically equaled the severity of the listed impairments in 20 CFR Part 404, Subpart P, App'x 1. (*Id.* at 12.)  Specifically, the ALJ found that no treating or examining physician had made findings that are the same or equivalent in severity to the criteria of any listed impairment, including listings 12.04, 12.06 or 12.09. (*Id.* at 29-30.)

The ALJ next concluded that plaintiff has mild restriction in activities of daily living, noting that the plaintiff's complaints that she had problems grooming and getting out of bed were consistent with mild limitations. (*Id.* at 29.)  The ALJ next found that plaintiff has moderate difficulties in social functioning, noting that she has a close relationship with her

---

[5] Though we remand on other grounds, the Commissioner should be mindful on remand that she must assess Lugo's mental impairments pursuant to the special technique, as required by 20 C.F.R. § 404.1520a.

sister and at times has a boyfriend. (*Id.*)  The ALJ further

found that plaintiff has no difficulties with regard to

concentration, persistence, and pace, noting that one of the

consultative examiners found that the plaintiff had intact

concentration and attention. (*Id.* at 29-30.)  The ALJ next

found that plaintiff had no episodes of decompensation, noting

that plaintiff was hospitalized in June 2015 but stating that

there was no evidence of additional exacerbations. (*Id.* at 30)

Furthermore, the ALJ found that claimant is able to function

outside of a highly-supportive living environment or is able to

function outside of her home, noting that plaintiff "rides in

cars" and "travels independently." (*Id.*)

At step three, the ALJ found that plaintiff had the

residual functional capacity to perform light work as defined in

20 CFR 404.1567(b) and 416.967(b) and can sit, walk and stand in

an 8-hour day with normal work place breaks.  The ALJ found that

plaintiff can kneel, crouch, bend, and use her arms and hands

without limitation. Plaintiff can occasionally squat.  Plaintiff

was found to have some mental issues and the ALJ found some

evidence that alcohol abuse was in sustained partial remission

and cannabis abuse was in sustained partial remission resulting

in plaintiff being able to follow and understand simple

instructions, perform simple tasks independently, maintain

attention and concentration for simple tasks, keep a schedule

and learn new tasks and perform more complex tasks with supervision.  The ALJ further found that plaintiff can adequately relate to others but has moderate problems with stress, which must be accommodated by having goal oriented, rather than production rate pace tasks.  (*Id*. at 31.)

At step four, the ALJ concluded that plaintiff was capable of performing her past relevant work as an appointment clerk as it is generally performed in the national economy.  (*Id*. at 38.)

Based on the foregoing analysis, the ALJ found that the plaintiff was not under a disability from June 1, 2012 through the date of the decision.  (*Id*. at 39.)

## III. The ALJ's Error in Applying the Five-Step Analysis

"[A]n ALJ should defer to 'to the views of the physician who has engaged in the primary treatment of the claimant.'" *Cichocki v. Astrue*, 534 F. App'x 71, 74 (2d Cir. 2013) (quoting *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003)).[6] "However, '[a] treating physician's statement that the claimant is disabled cannot itself be determinative.'" *Id.* (quoting *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)). "Rather, 'a

---

[6] The Commissioner has revised its rules to eliminate the treating physician rule, and ALJs are now to weigh all medical evaluations, regardless of their sources, based on how well supported they are and their consistency with the remainder of the record. *See* 20 C.F.R. §§ 404.1520b; 416.920c. Claims filed before March 27, 2017, however, are still subject to the treating physician rule, *see id.* § 404.1527(c)(2), and the Court accordingly applies the rule to this case, as plaintiff filed her claim on May 30, 2013. *See, e.g., Conetta v. Berryhill*, 365 F. Supp. 3d 383, 395 n.5 (S.D.N.Y. 2019).

treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s)' will be given 'controlling weight' if the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record.'" *Id.* (quoting 20 C.F.R. § 404.1527(c)(2)).

"An 'ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various factors to determine how much weight to give to the opinion,' including: '(i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.'" *Id.* (quoting *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004)). "The ALJ must then 'comprehensively set forth his reasons for the weight assigned to a treating physician's opinion.'" *Id.* (quoting *Burgess*, 537 F.3d at 129).

In this analysis, although an ALJ should generally explain the weight given to each opinion, remand is not required where application of the proper legal standards would lead to the same

31

conclusion previously reached. *See Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010). Failure to consider the opinion of a treating physician "ordinarily requires remand to the ALJ for consideration of the improperly excluded evidence, at least where the unconsidered evidence is significantly more favorable to the claimant than the evidence considered." *Id.* at 409. "Remand is unnecessary, however, '[w]here application of the correct legal standard could lead to only one conclusion.'" *Id.* (quoting *Schaal v. Apfel*, 134 F.3d 496, 504 (2d Cir. 1998)). For instance, in *Zabala*, the court found it was harmless error to "exclude[] evidence [that was] essentially duplicative of evidence considered by the ALJ," as there would be no reasonable likelihood that consideration of the unconsidered report would change the outcome. *Id.* at 409-10 (noting that "[t]he [unconsidered] report [was] largely identical to a [different] report by the same doctor, which the ALJ did consider," and which set forth substantially identical findings).

The Commissioner argues that the ALJ gave proper weight to the medical sources and that the ALJ's decision is supported by substantial evidence. (*See* Def. Mem. at 10.) Plaintiff argues that the ALJ failed to properly evaluate the opinion of the plaintiff's treating psychiatrist, Dr. Senosian, and that of Dr. Denigris. (Pl. Mem. at 13-15; Tr. at 35.) The court finds the Commissioner's argument unavailing for three primary reasons.

*First*, ALJ Romeo only accorded "little weight," rather than "controlling weight," to claimant's treating physician, Dr. Senosian, who opined, among other things, that plaintiff would not be able to meet competitive standards in every category regarding her ability to perform unskilled work.  (*Id.* at 35.) In support of granting "little weight" to Dr. Senosian, the ALJ explained that Dr. Senosian had frequently assessed plaintiff with a GAF score ranging between 50 and 60 and that therefore, his opinion is inconsistent with his treatment notes.  (*Id.* at 35.)  The Second Circuit recently held that an ALJ errs when she assigns little weight to a treating psychiatrist's opinion based on GAF scores. *See Estrella v. Berryhill*, 925 F.3d 90 (2d Cir. 2019).  The ALJ must consider, *inter alia*, "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence, and (4) whether the physician is a specialist." *Id.* at 95-96. (quoting *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (per curiam) (citing *Burgess*, 537 F.3d at 129 (citing 20 C.F.R. § 404.1527(c)(2))).

As in *Estrella*, ALJ Romeo's explanation addresses only the single factor of "consistency," and fails to consider the length, nature, and extent of the treatment relationship; the evidence in support of the treating physician's opinion; the

33

consistency of the opinion with the record as a whole; and whether the opinion was from a specialist.  The ALJ failed to address the fact that Dr. Senosian, a board-certified specialist, issued an opinion supported by the weight of evidence, including mental status examinations regularly noting: sad and anxious mood, constricted affect, poor insight and judgment, perseverative thoughts patterns, impaired memory, and the plaintiff's involuntary admission to a psychiatric ward in the summer of 2015.

Failure "to provide good reasons for not crediting the opinion of a claimant's treating physician is ground for remand." *Sanders v. Comm's of Soc. Sec.*, 506 F. App'x 74, 77 (2d Cir.); *see also Halloran*, 362 F.3d at 32-33 ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion."). The limited rationale offered by the ALJ that Dr. Senosian's opinion contrasts the GAF score assigned does not meet the bar of providing good reasons and is thus insufficient.

*Second*, the ALJ's evaluation of Dr. Denigris' opinion is unsupported by the record.  In assigning little weight to Dr. Denigris' opinion, the ALJ states that "treatment notes indicate that the claimant did have a boyfriend and is able to spend time with family and friends (Exhibits 1F at 53, 8F at 6). Thus, the records would indicate the claimant has only intermittent

problems with people.  Also, there is an indication that when
the claimant is on medication her condition is stable.  (Exhibit
13F, at 10)."  (Tr. at 35.)  The ALJ's reading of the exhibits
is factually deficient, as demonstrated below.

Exhibits 1F at 53 and 8F at 6 do not support a finding that
plaintiff has only intermittent problems with people.  Exhibit
1F at 53 indicates that plaintiff was "more depressed" and had
broken up with her boyfriend.  The treatment note indicates that
the session also focused on helping plaintiff with her
communication with her mother.  (*Id.* at 293.)  Ending or
requiring professional assistance with key relationships is not
evidence that plaintiff is capable of socializing.  The
treatment note does not make any reference to plaintiff
socializing with any other family member or friend.  Further,
Exhibit 8F at 6 reveals the notation, "Interpersonal
Relationships: Patient is socially isolated."  (*Id.* at 325.)
Social isolation is plainly inconsistent with any demonstrated
ability to socialize.

Further, Exhibit 13F at page 10 does not evidence a patient
whose condition is stable while on medication.  (*Id.* at 353.)
Plaintiff was described as having risk factors for suicide which
included "anxious/agitated, depression, hopelessness, rational
thinking loss, alcohol and substance abuse, previous attempt and
intermittent ideations."  (*Id.*)  Plaintiff was described as

having "fair" insight, judgment and impulse control. (*Id.*)
Plaintiff was given the diagnosis of Axis I: Bipolar affective
disorder, depressed, severe, with psychotic behavior and PTSD.
(*Id.*)  The narrative portion of the treatment note states,
"presents with symptoms of depression, anhedonia, anger,
hopelessness, insomnia, racing thoughts, agitation…Patient
experiences flashbacks and nightmares of her abuse."  (*Id.*)  The
report notes in plain language that the plaintiff's condition
was "severe" despite compliance with medication.  Nothing in the
treatment notes indicate plaintiff's stability.

　　　*Third*, the ALJ erred in giving weight to the opinion of
Melissa Malakoff, Ph.D., because the opinion was rendered in
2013, two years prior to a worsening of plaintiff's condition in
2015.  The Commissioner asserts that the ALJ properly considered
that the plaintiff's condition worsened in 2015 in making her
decision.  (*See* Def. Mem. at 8.)  Upon review of the oral
hearing transcript, however, the court cannot agree with the
Commissioner's assertion.

　　　Though the court is aware that it is not an uncommon
practice among ALJ's to request that a plaintiff amend the onset
date to a later time for which the ALJ finds evidence to support
disability, rarely do such negotiations take place on the
record.  As per the hearing transcript:

> ALJ: All right.  And at this point my feeling is in looking
> at the record when she has her break in June of 2015 it
> seems that she has some serious problems. Now her own
> doctor alleges that these problems, these serious problems
> don't exist until January of 2015.  I'm not sure where the
> doctor got January of 2015 but that's her own doctor saying
> that.
>
> CLMT: But that's when she started –
>
> ALJ: No, she starts in August of – she starts what in July
> of August – July of 2015.  So that's what I'm looking at.
> So what are we doing?
>
> ATTY: Claimant is sticking with her alleged onset date of –
>
> ALJ: Very good. We'll have a supplemental hearing with a
> Vocational Expert.  Thank you very much…"

(Tr. at 70.)  The ALJ indicated that if plaintiff changed her

alleged onset date, the case would not require a vocational

expert.[7]  Despite this interchange, and despite the

Commissioner's assertions that the ALJ considered that there was

a worsening of plaintiff's condition, the ALJ's decision fails

to take into account plaintiff's worsening condition.

Furthermore, there is nothing in the ALJ's decision to indicate

that the ALJ considered that Dr. Malakoff's opinions were

rendered prior to plaintiff's worsening condition in July 2015.

As such, the court cannot state that the ALJ properly assessed

Dr. Malakoff's opinions, and thus finds error.

---

[7] It is unclear to the court why the ALJ indicated on the record that the
plaintiff's condition was disabling as of July 2015, but denied the claim
nonetheless without issuing at least a partially favorable decision.

Because the ALJ committed legal error in making her determination, the court does not find that the ALJ's decision is supported by substantial evidence.

## CONCLUSION

Federal regulations explicitly authorize a court, when reviewing decisions of the Social Security Administration, to order further proceedings when appropriate. Remand is warranted where "there are gaps in the administrative record or the ALJ has applied an improper legal standard," *Rosa*, 168 F.3d at 82–83 (quoting *Pratts*, 94 F.3d at 39) (internal quotation marks omitted), particularly where further findings or explanation will clarify the rationale for the ALJ's decision, *Pratts*, 94 F.3d at 39.  In this action, remand is appropriate because ALJ Romeo: did not appropriately consider Listing 12.15 or explain why plaintiff did not meet or equal said listing; did not properly weigh the medical opinions pursuant to the treating physician rule; and did not explain her rationale for failing to issue at least a partially favorable decision after stating that the Plaintiff should be considered disabled as of July 2015.

As the court finds that the ALJ erred in the decision, and that further development and consideration of the record, and clarification of the rationale of the ALJ's decision, are necessary to facilitate proper review, this case is remanded for

further proceedings in accordance with this Memorandum and

Order.


**SO ORDERED.**

Dated:     May 5, 2020
           Brooklyn, New York


                                    _____/s/_____
                                    **HON. KIYO A. MATSUMOTO**
                                    United States District Judge
                                    Eastern District of New York